Two questions are presented for our consideration in this case: 1st. Whether the contracts made by the letting board are valid and complete without the approval of *Page 108 
the canal board? And, 2d. Whether the law itself is not void as repugnant to the constitution?
The first question is of minor importance — perhaps, if we are correctly informed as to the action of the legislature, of no moment whatever, except as to its influence on the decision of this particular case.
I have examined it, however, and am inclined to believe that the contracts were not valid, for want of the approval of the canal board.
The twelfth section of the act directs the canal commissioners, state engineer, c., to contract for the completion of the Erie Canal enlargement, c., upon such terms, and in such manner as the canal board shall direct and approve.
The return to the mandamus shows that the canal board have merely directed the terms in which the subordinate board shall contract, and that the canal board never have approved of the manner in which their directions have been carried out; never have inquired in what manner they have been attempted to be followed, nor whether they have not been entirely disregarded.
It is evident to me that it was the intention of the statute to require the judgment and decision of the canal board, and to commit to the subordinate board the mere executive duty of carrying out such decision. It is in no other manner that I can find aliment for the provision that the canal board shall "approve." Their refusing to do more than than they have done, is, in effect, striking the word "approve" out of the statute. It was their duty to do more than merely direct the terms on which the contracts should be made. It was necessary for them to approve the manner in which it was proposed to contract. When they did that and approved of the action of the other board, and not till then, were the contracts valid and effectual. It is thus alone that full force can be given to all the provisions of the statute.
The other question involves the constitutionality of the law, and whether the contracts executed under it, even if duly approved, would be valid? *Page 109 
In examining this question, I shall inquire,
1. What is the scheme of the constitution?
2. What that of the statute? And,
3. Whether they are repugnant to each other?
And I enter upon the examination thoroughly imbued with the principle, that the task of determining that a law is void by reason of its repugnancy to the constitution, is at all times one of extreme delicacy: that it ought seldom, if ever, to be done in a doubtful case: that it is not on slight implication and vague conjecture, that the legislature is to be pronounced to have transcended its powers (Fletcher vs. Peck, 6 Cranch, 128): that it is only in express constitutional provisions, limiting legislative power and controlling the temporary will of a majority by a permanent and paramount law, settled by the deliberate wisdom of the nation, that we can find a safe and solid ground for the authority of courts of justice to declare void any legislative enactment (Cochran vs. Van Sarlay, 20Wend. 382): that in construing the language of a constitution we have nothing to do with arguments ab inconvenienti, for the purpose of enlarging or contracting its import, the only sound principle being, to declare ita lex scripta est, to follow and to obey (People vs. Morrell, 21 Wend. 584): that there is no safe rule for construing the extent or the limitation of powers in a constitution other than is given by the language of the instrument which confers them, taken in connection with the purposes for which they were conferred (Gibbons vs. Ogden, 9Wheat. 188): and that the opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other (6Cranch. 188; 1 Cowen, 564).
When such an incompatibility is manifested, I agree with Ch. J. Marshall, whose sentiments I have already quoted, that the court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the high obligations which that station imposes.
I proceed, then, to inquire, *Page 110 
What is the scheme of the constitution in that part bearing upon the question before us?
In order properly to understand it, we must become acquainted with the circumstances out of which its provisions sprung, and upon which it was designed they should act.
The Erie and Champlain canals, extending a distance of 427 miles, were completed in October, 1823, so far as to allow of their navigation to the whole extent. On the 1st of January, 1825, it was ascertained that their cost had been about $10,000,000, and the state was then owing a debt, contracted for their construction, amounting to $7,467,770.99. It was then already apparent that their revenues would be sufficient to discharge that debt at an early period. And as early as that date, there sprung up from these circumstances two conflicting systems of canal policy, which have more or less agitated our public councils for the last quarter of a century. One of them proposed an extensive scheme of internal improvements, involving the construction of many other canals, and the expenditure of many millions, which were to be obtained in the first instance by loans, and to be repaid out of the canal revenues. The other deprecated the creation of a debt, and insisted that such works could be safely undertaken and carried on only out of surplus revenues as they should accrue.
As one or the other of these systems of policy prevailed, and in the process of time each had by turns the ascendancy, our works of internal improvement advanced or halted, producing, however, in the mean time, as additions, the Cayuga and Seneca, the Crooked Lake, the Chemung and the Chenango canals, adding many miles of canal to our public works, and involving the expenditure of many millions more. The means for these expenditures, also, were obtained by loans. No one, at that day, was bold enough to advocate the policy of an irredeemable debt, but all looked forward to an early extinguishment of whatever might be contracted. This sentiment prevailed in the constitutional convention of 1821, and hence it was provided in the instrument which they framed, that the *Page 111 
debt then existing should be paid when it became due, and that the revenues of the canals, including the auction and salt duties, should be inviolably appropriated and applied to the completion of the navigable communication between the great western and northern lakes and the Atlantic Ocean, and to the payment of the interest and the reimbursement of the capital of the money already borrowed or which should be borrowed to make and complete them (Constitution of 1821, Art. III, § 10).
During the ten years that ensued from 1824, the construction of five other canals had been authorized, and the canal revenues had already produced nearly enough to extinguish the debt that was owing in 1825.
On the 1st of January, 1835, the Erie and Champlain Canal debt was about $5,000,000; there was in the treasury accumulated from the revenues about $3,000,000, and it was evident that the revenues of the ensuing two or three years would be more than sufficient to pay the whole of that debt nearly ten years before it should become due.
At the same time the state owed a debt of over $2,000,000, contracted on account of the lateral canals, whose construction, as already mentioned, had been authorized within the preceding ten years, and an additional debt of at least $1,000,000 was anticipated to be necessary for their completion. The general fund, out of which alone the ordinary expenses of government were provided for, had been reduced by various drains upon it, from about $5,000,000 to about $200,000, so that it was evident that the ordinary expenses of government, which amounted to about $450,000 a year, must be provided for by resort either to the canal revenues, to a system of continual borrowing, or to direct taxation. The duties on auctions and on salt, which at that time amounted to $330,000 a year, and which by the constitution had been pledged to the payment of the canal debt, had been diverted for that purpose, from the general fund, to which they had once belonged, and where they had performed the office of contributing to defray the expenses of government. By amendments proposed to the constitution in 1832 and 1834, *Page 112 
and which were adopted in 1833 and 1835, those duties were released from the constitutional pledge, and returned to their original avocation. So that in 1835, the original canal debt was provided for, another canal debt of about $3,000,000 had been authorized, the ordinary revenues were not sufficient for the ordinary expenses of government, and the canals were yielding a surplus of revenue (above the interest on the debt, and the expenses) of about $600,000 a year, with the certain prospect of continual augmentation.
Under this state of things, the legislature, at their session of 1835, directed the Erie Canal to be enlarged and a double set of lift locks to be constructed, and enacted that the cost of constructing, completing and maintaining the works, should be paid out of any moneys which might be on hand belonging to the Erie and Champlain canal fund, and provided that after 1837 the expenditures should be so limited as to leave from the canal revenues besides the auction and salt duties, an annual income to the state of at least $300,000. Thus appropriating out of the revenues previously pledged to the canal debt, five or six hundred thousand dollars a year for the ordinary expenses of government, and devoting the remainder of the revenues, when received and "on hand," to the task of enlarging the canal; and clearly defining the policy of effecting the enlargement by means of earnings actually on hand, and not by contracting a debt for that purpose.
But in 1838 that policy was abandoned, and instead of it was adopted the policy of hastening the enlargement by loans. The sum of $4,000,000 was authorized to be borrowed that year, and that policy continued until 1842, when the whole debt of the state, over funds on hand, which in 1835 had been about $4,500,000 was now $24,674,000.
In the mean time, the construction of two additional canals had been authorized — the Black River Canal at an expense of about $1,000,000, and the Genesee Valley canal at the cost of at least $2,000,000, and the moneys raised by loans for their construction had been in part expended. In that year (1842) the canal policy of the state again changed. Alarmed at the *Page 113 
magnitude of the debt already contracted, and at the prospect of farther augmentation, the legislature directed all further expenditure on the public works, then in the progress of construction, to be suspended, imposed a tax on all the real and personal estate within this state, and pledged one half that tax to canal purposes, and so much of the canal revenue as should be equal to one third of the interest of the canal debt as a sinking fund for the redemption of the debt thus contracted.
And when the new constitutional convention assembled in 1846, the enlargement of the Erie Canal, and the construction of the Black River and Genesee Valley canals were unfinished; the total of the liabilities of the state was $25,258,597.95; the canal revenues, derived from tolls and water rents since the completion of the Erie and Champlain canals, had exceeded the expenditure, on account of them, nearly $19,000,000; the nett revenue for the preceding five years had averaged a fraction over a million and a half dollars, with every reason to believe that in ten years' time such nett revenue would exceed two millions and a quarter a year.
It was under such circumstances, and for such a state of things, that the constitutional convention of 1846 entered upon the duty of making permanent provision in relation to the finances of the state.
Each of the conflicting systems of policy already mentioned had its friends and advocates in that body and among the people, and they were distinctly presented to view when the constitution was framed and adopted.
These considerations must necessarily be borne in mind in examining the question now before us; for without them we can not know what were the purposes for which the constitution granted its powers or imposed its limitations, nor can we well comprehend the meaning or intention of the provisions it contains.
Such, then, was the subject on which the constitution was to operate, and the next inquiry is: What was its action on that subject? What rights, powers and privileges did it confer? And what obligations or restrictions impose? *Page 114 
In answering these questions in a becoming spirit of candor, it will never do to content ourselves with confining our attention to detached portions of the instrument, but its whole scope and tenor must be considered, and in such a manner that full force must be given to all its provisions.
Nor will it do to invoke the aid of the familiar, though not very well understood distinction between peremptory enactments, which must at all hazards be obeyed, and directory ones, which may be disregarded with impunity. The principle relative to directory statutes applied to a fundamental law, granting or limiting power, would be fraught with very dangerous tendencies.
Besides, when an enactment imposes an obligation to do or to abstain, its language is always imperative.
Keeping these principles in view, we find that this was the scheme of the constitution:
1. That no debt for the purpose of internal improvement, exceeding $1,000,000 should ever be contracted, unless sanetioned by the people, not speaking through the legislature, but voting directly on the subject at a general election:
2. That out of the canal revenues a certain amount should be set apart each year as a sinking fund, to pay the interest and redeem the principal of the canal debt then existing:
3. That a certain portion of the canal revenues should be set apart as a sinking fund, in like manner to redeem and pay the other debts of the state, and not comprehended in the term "canal debt:"
4. That after paying those sums, a certain amount ($200,000) should be annually set apart to defray the ordinary expenses of government; an amount not enough to meet all those expenses, but thereby relieving the people in some degree from the necessity of bearing direct taxation to carry on the ordinary operations of the government:
5. That the remainder of the revenues of the canals, after these objects should be accomplished, should, in each year, be applied to the purpose of enlarging the Erie Canal, c.:
6. That after these debts were all paid, and those works all *Page 115 
completed, there should be appropriated annually from the canal revenues a sum sufficient to defray all the expenses of government, and thus relieving the people from any taxation for that purpose for all time to come:
7. And that whenever any debt should be contracted under the direct authority of the people, the same law which they should approve should impose a direct tax sufficient to pay the interest and redeem the principal within eighteen years.
Such, in a few words and in plain terms, are the provisions of the constitution on this subject. The next inquiry is, what are those of the act in question?
1. It appropriates the surplus revenues of the canal, for the years 1851, 2, 3 and 4, directly to the work of enlarging the canal, c.;
2. It authorizes, by its peculiar machinery of canal certificates, the officers of the state to borrow $9,000,000, within three years, and expend that for the same purpose;
3. It directs that sum to be returned within twenty-one years, and in the mean time an interest, not over six per cent, be paid on it;
4. It pledges the surplus revenues for that period of twenty-one years to the repayment of that sum of $9,000,000, and the interest upon it; and
5. It does not submit the question to the electors to be passed upon directly at a general election, but instead of that, declares that the certificates shall in no event or contingency be so construed as to create a debt or liability against the state or the people thereof within the meaning of the constitution.
It only remains to inquire whether there is any incompatibility between the statute and the constitution.
1. This act of borrowing $9,000,000, and providing for its repayment within a certain time, with interest for its use in the mean time, seems to me to create a debt. No subtlety of reasoning, no refinement of argument have been sufficient to dispel from my mind this plain and simple idea.
It is said that it is not a debt, but merely anticipating the resources of the state as derived from the canals. Now, it seems *Page 116 
to me that all debt, whether by individuals or states, is merely an anticipation of resources.
Then again it is said that it is no debt, because only a portion of the resources of the state are devoted to the repayment. Does the fact that every householder has certain property that is not liable for the payment of his debts destroy or even change the character of the obligation that rests upon him to repay money that he has borrowed.
These, and such like suggestions, which were made to us on the argument, have not had the effect to persuade me that borrowing money is not contracting a debt.
And, if I read aright, the national debt of Great Britain — the existence of which no one probably will, at this day, deny — was begun in the precise manner adopted in this statute.
Smith's Wealth of Nations (vol. 2, p. 449), says that "When the resource of borrowing on personal credit was exhausted, and it became necessary, in order to raise money, to assign or mortgage some particular branch of the public revenue, government has done this in two different ways. Sometimes it has made this assignment or mortgage for a short period only — a year, or a few years, for example — and sometimes for perpetuity. In one case, the fund was supposed sufficient to pay, within the limited time, both principal and interest of the money borrowed; in the other it was supposed sufficient to pay interest only, or a perpetual annuity equivalent to interest. When money was raised in the one way, it was said to be raised by anticipation — when in the other, by perpetual funding.
"In Great Britain, the annual land and malt taxes are regularly anticipated every year, by virtue of a borrowing clause constantly inserted into the acts which impose them. The Bank of England generally advances at an interest, which, since the revolution, has varied from eight to three per cent, the sums for which those taxes are granted, and receives payment as their produce gradually comes in. If there is a deficiency, which there always is, it is provided for in the supplies of the ensuing year. The only considerable branch of the public revenues which yet remains unmortgaged is thus regularly spent before *Page 117 
it comes in. Like an improvident spendthrift, whose pressing occasions will not allow him to wait for the regular payment of his revenues, the state is in the constant practice of borrowing of its factors and agents, and of paying interest for the use of its own money."
If then, it is a debt which this statute creates, it is in direct violation of the constitution, because it has never been submitted to or passed upon by the people.
2. It seems to me that the payment of interest on borrowed money, out of the canal revenues, was not intended by the constitution, because it tends to retard the advent of the period when the canal revenues can be applied to the general support of the government. Under this law, $540,000 a year, for twenty-one years, must be withdrawn from those revenues to pay interest on the $9,000,000 borrowed, and to that extent the appropriation, under section 3 of article 7 of the constitution, of $672,500 a year, to defray the ordinary expenses of government, must be postponed or affected, and to precisely that extent, a resort to direct taxation be rendered necessary to meet those ordinary expenses.
This consideration is not an unimportant one, for both in and out of the convention, and long prior to it, it was insisted by a portion of the citizens of the state, that they had derived no benefit from the canals, and yet funds belonging equally to them as to others had been expended for their construction, until direct taxation was necessary to carry on government, and they claimed that the canals should return those funds to the treasury, at least to the extent of avoiding taxation for the necessary expenses of government. Hence the appropriation in section 3, article 7, of the constitution, of $200,000 a year to defray the necessary expenses of the state, before any thing should be applied to the enlargement of the canal, c; the provisions that if, after eight years, the revenues unappropriated by that article should not be sufficient to defray those expenses, without a direct tax, the legislature might appropriate $350,000 a year from the canal revenues to those expenses, and the provision that when the canal debt should be paid and the *Page 118 
works completed, $672,500 annually should be forever devoted to the ordinary support of government.
Thus the constitution provided, by a regard to all the interests involved, and in a spirit of compromise, that the debt should be paid, the works completed, and the people at large be exempted from direct taxation, nnless by a direct vote, given at a general election, they should themselves impose such tax.
And I entertain no doubt that it was the intention of the constitution to afford to the people of the state, in due time, out of the canal revenue, a full protection against direct taxation for the support of government, by appropriating what the public works might yield to that purpose.
Whatever may be our individual views of the policy that prevailed in and characterized that instrument, it is our solemn duty, as a court, sacredly to preserve its compromises. And it requires no argument to show that any act diverting those revenues to the payment of interest, or any other purpose, from that thus clearly defined in the constitution, must be in derogation of it.
3. The plain language of the constitution in reference to the surplus revenues is, that they "shall in each fiscal year be applied to the enlargement of the canal," c.
Does this authorize them to be anticipated, so that they may be expended before the fiscal year in which they accrue? If it does, then, with equal propriety, they may be withheld a series of years from the object to which they are devoted, for if any deviation from the explicit injunction of the instrument is to be tolerated, it may be as well in one direction as another.
It seems to me that it was the intention of the constitution to adopt fully the policy of 1835, and have the contemplated works carried on just as fast and no faster than funds were actually on hand for the purpose; and that it would be as wrong for the state to delay the application of those funds on the one hand, as it would be to anticipate them on the other; as wrong to divert them to any other purpose as to encumber and consume them by the payment of interest. *Page 119 
It is the plain language of the constitution which brings me to this result, and here, as throughout, I am governed by the rule laid down by the supreme court of the United States, in Gibbons
v. Ogden (9 Wheat. 184), that as men whose intentions require no concealment generally employ the words which most aptly and directly express the ideas they intend to convey, the framers of the constitution must be understood to have employed words in their natural sense, and to have intended what they have said.
I have thus been conducted to the conclusion that this statute, in its general scope and purposes, is incompatible with the constitution, and must be declared void.
I have not been unmindful of the consequences that may flow from such a result, and which were so strenuously pressed upon our consideration by one of the counsel. I see much in those anticipated consequences to awaken regrets, but nothing to justify me in construing the constitution otherwise than according to its plain import. It would be a dangerous principle to permit the consequences that may flow from correcting an infraction of the fundamental law to perform the office of perpetuating such infraction. "The constitution and laws of a state are the basis of public tranquility, the firmest support of political authority, and a security for the liberty of the citizen. But this constitution is a vain phantom, and the best laws are useless, if they be not religiously observed. The nation ought then to watch very attentively, in order to render them equally respected by those who govern, and by the people destined to obey."
Such is the duty which now devolves upon this court in behalf of the state, and it ought to be performed with a fidelity commensurate with its importance.
Judges GARDINER and JEWETT concurred in the opinion of the chief judge and judges Johnson and Edmonds.